[No. 826-3.    Division Three.    February 5, 1975.]

HERBERT P. WATKINS et al., *Respondents*, v. FMC CORPORA-
TION—NIAGARA CHEMICAL DIVISION, *Appellant*.

*William H. Mays* (of *Gavin, Robinson, Kendrick, Redman & Mays*), for appellant.

*Alan A. McDonald* (of *Halverson, Applegate, McDonald, Bond, Grahn, Wiehl & Almon*), for respondents.

GREEN, J.—About August 22, 1969, defendant recommended and sold to plaintiffs a product known as "245-TP" for spray application to plaintiffs' apple orchards. This action was brought to recover damages plaintiffs allegedly sustained from that application in August and September 1969. Defendant's liability was established in a separate trial and it appeals only from the judgment entered upon the jury verdict as to damages.

Two issues are presented: (1) Did the trial court err in refusing to allow defendant's expert witness to testify as

to the fair market value of plaintiffs' real property immediately before and after the application of the chemical, 245-TP? (2) Was it error to refuse admission of a portion of plaintiffs' income tax returns?

As to the first issue, defendant contends that the chemical caused permanent damage to plaintiffs' orchards and thus to their real estate and, therefore, evidence of the difference in value of the real estate immediately before and after the injury should have been admitted on the issue of damage. We disagree.

The authorities cited by defendant in support of its contention are cases where, as a result of some type of injury, the tree or crop dies, or as a result of fire or removal the tree, crop or building is consumed or destroyed.[1] In these

---

[1] *DeYoung v. Swenson,* 6 Wn. App. 452, 493 P.2d 1247 (1972) (burning and destruction of a barn); *B. & B. Farms, Inc. v. Matlock's Fruit Farms, Inc.,* 73 Wn.2d 146, 437 P.2d 178 (1968) (destruction of crop); *Marrion v. Anderson,* 36 Wn.2d 353, 218 P.2d 320 (1950) (destruction of small orchard); *Lawson v. Helmich,* 20 Wn.2d 167, 146 P.2d 537, 151 A.L.R. 930 (1944) (apple trees cut down and removed); *Dierssen, Inc. v. May Valley Logging Co.,* 138 Wash. 263, 244 P. 564 (1926) (standing timber destroyed by fire; measure is diminution in value of premises or, if equal, the value of the timber destroyed); *Park v. Northport Smelting & Refining Co.,* 47 Wash. 597, 92 P. 442 (1907) (growing timber destroyed). In *Barci v. Intalco Aluminum Corp.,* 11 Wn. App. 342, 522 P.2d 1159 (1974), the jury was allowed to consider the alternative measure of damage for injury to the farmland caused by emissions from an aluminum reduction plant constructed near plaintiff's property. But the court distinguished the proper measure of damages for the injury to productive growing things.

> In the case of crops, the measure of damages is the reduction in the value of the crop from the value that could otherwise have been expected, taking into account market conditions at the time of their expected sale. In the case of livestock, a similar measure of damages is applicable, particularly in the case of dairy herds where the loss in productivity following exposure to harmful emissions is the measure."

*Barci v. Intalco Aluminum Corp., supra* at 355 n.2. Furthermore, in *Barci* the instrumental cause of the injury is continuous and ongoing, and not a once-spent and finite cause as we have in the instant case. Similar in nature are *Senglaup v. Acker Process Co.,* 105 N.Y. Supp. 470 (S. Ct. 1907); and *St. Louis Smelting & Refining Co. v. Henke,* 277 F. 665 (7th Cir. 1922).

situations, courts have admitted evidence of the difference in market value of the real estate immediately before and after the injury or destruction on the issue of damage. *See* Annot., 69 A.L.R.2d 1335, 1365 (1960). Here, we do not find a destruction of plaintiffs' orchards in the sense contemplated by these authorities.

The application of the chemical, 245-TP, damaged the 1969 crop of apples and retarded the orchards' future production for a period of time. The apple trees were not killed or destroyed; instead, plaintiffs lost the productive use of each damaged tree for a period equal to the time required to rehabilitate it. As the trial judge noted:

> The record is relatively clear, and I don't think there's any question in anybody's mind, and the testimony from both sides have indicated that with a program of pruning and reshaping and the various other necessary farming practices, that these trees can regain their growth and vigor. The testimony is replete that there is no root damage and that the trees will come back to a vigorous tree, and this particular tree in evidence has been used many times. The defense has illustrated by use of charts that, perhaps a year or two of retardation as far as the tree, that they immediately regain and come back into production. *I think that the issue that we are talking about in this matter is the loss of a couple of years of production off of these trees.* In other words, not a permanency in terms of removal of the *trees or complete destruction of the trees*; that would then smack of or pertain to an inverse condemnation type of situation. I think that what we are talking about here is loss of production. . . . What we are talking about then in that instance is crop loss or production loss and not a permanent damage to the orchard. I think that no reasonable person would understand from the testimony that we have had here that these trees are permanently lost in terms of a permanent damage, and inverse type of taking as we would have, and I would therefore have to rule that the before and after type of appraisal, as far as these ranches are concerned, is not admissible, it's not material to this case.

(Italics ours.) and further explained:

The testimony . . . from the Watkins [sic] and from everyone else that is in this case is that the trees were not removed, that instead the proper procedure—and even Dr. Heinicke indicated in his own testimony in qualifying what he said about block removal, the first thing you do is to cut them back hard, attempt to retrain them and if they do not respond, then he would recommend that they be removed as a block. But, in this case there is no evidence whatsoever to indicate that these trees are not responding and that there's not new growth coming as far as these trees are concerned nor that any trees have been removed as a block or even individually. So, I, in going over this in my mind and sort of anticipating that this might be coming along, I thought about it and tried to review the testimony and, I believe, that if we clean up our semantics a little bit in terms of what we are talking about as far as permanent loss or production for a period of two years, which is basically the issue, and the issue is, of course, when does that loss of production come; does it come at this time or does it come later on in the productive, commercially productive years of the trees; that is an issue for the jury to decide, of course.

The court's comments are clearly supported by the record.

■■■■ We do not agree with the defendant's contention that because the 2 years or so of retarded production can never be regained, a permanent damage occurred that can be measured by the difference in market value of the real estate immediately before and after the injury. Rather, the damage sustained by plaintiffs is more analogous to the loss of use of an automobile during the time necessary to repair it after a collision. *Holmes v. Raffo*, 60 Wn.2d 421, 429, 374 P.2d 536 (1962); *Ackerman v. Tonkoff*, 72 Wn.2d 698, 435 P.2d 31 (1967), or the award for loss of wages to an injured person during his recovery. *Stoddard v. Smathers*, 120 Wash. 53, 58, 206 P. 933 (1922); *Ewer v. Goodyear Tire & Rubber Co.*, 4 Wn. App. 152, 164, 480 P.2d 260 (1971). Moreover, where damaged premises can be restored to their original condition, the damage is temporary and the measure of damage urged by defendant has not been applied.

For example, in *Harkoff v. Whatcom County*, 40 Wn.2d 147, 152, 241 P.2d 932 (1952), the court in determining the measure of damage sustained by a plaintiff whose land was temporarily flooded by waters from a roadside ditch, said:

> If the injury is permanent, the general rule applicable is the difference between the market value of the property immediately before the damage and its market value immediately thereafter. *If . . . the property may be restored to its original condition the measure of damages is the reasonable expense of such restoration, and in a proper case the loss of use or of income therefrom for a reasonable time pending such restoration.*

(Italics ours. Citations omitted.) *Accord, Colella v. King County*, 72 Wn.2d 386, 433 P.2d 154 (1967); *Olson v. King County*, 71 Wn.2d 279, 293, 428 P.2d 562, 24 A.L.R.3d 950 (1967). There being no issue of fact as to whether the damage was temporary or permanent, we hold that evidence of the market value of plaintiffs' property before and after the injury was properly excluded as not relevant to a determination of damages based upon the temporary loss of use or production of the orchards during the period of the orchards' recovery. We reach this result bearing in mind the observation of C. T. McCormick, *Damages* § 137 (1935), that:

> The primary aim in measuring damages is compensation, and this contemplates that the damages for a tort should place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred, and that the damages for breach of contract should place the plaintiff in the position he would be in if the contract had been fulfilled.

and its recognition in *DeNike v. Mowery*, 69 Wn.2d 357, 358, 418 P.2d 1010 (1966):

> The purpose of awarding nonpunitive, pecuniary compensation to the injured party is to repair his injury, or to make him whole again as nearly as that may be done by an award of money.

*See* 22 Am. Jur. 2d *Damages* § 12 (1965). On the facts of

this case, defendant's theory is not in harmony with these underlying principles.

■ Secondly, defendant contends the court erred in refusing to admit into evidence Schedule F of plaintiffs' income tax returns for the years 1966-71. Defendant claims these returns were admissible to show plaintiffs' profit history as a means of impeaching plaintiffs' evidence. We disagree. Plaintiffs did not claim lost profits, but rather, damages for their net production loss. The evidence sought to establish lost production from each injured tree converted into boxes or tons of apples. The dollar amount of plaintiffs' damages was arrived at by deducting the cost of thinning, picking and handling from the dollar value of each box or ton to arrive at plaintiffs' net production loss in monetary terms. That is to say, plaintiffs attempted by their evidence to place a net gross value upon the apples not produced during the period that the injured trees were retarded. The fixed expenses for the overall orchard operation were not involved. The trial court in its ruling properly observed:

I'm prepared to rule at this time that they [income tax returns] would not be admissible. They would be confusing to the jury and they simply do not reflect anything. In other words, what the issue in this case is, is loss of production. There's nothing in the Schedule F that will have any bearing upon loss of production. What their income has been otherwise from the fruit that they did pick and did receive simply has no bearing upon their loss of production. The other point that counsel was looking at was in terms of deduction of cost of thinning, picking, everything else, the 30 cents per box figure, and the Schedule F returns simply do not indicate in any way that—there's no break down in there to indicate what the cost per box would be in respect to any of those items. As an example, there's nothing to indicate what thinning costs were or what picking costs were. It's simply lumped as one large figure in terms of labor and one large figure in terms of spray, and one large figure in terms of supplies, things of this nature. So, they are not

relevant to indicate anything in the cost per box of the labor or other items.

Lost profits not being in issue, the plaintiffs' income tax returns were not relevant and their admission was properly denied.

Affirmed.

McINTURFF, C.J., and MUNSON, J., concur.

Petition for rehearing denied March 10, 1975.